United States District Court
Southern District of Texas

**ENTERED**

March 23, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MB KINETOPLAY, LLC,<br>ERIC LAVANCHY, AND<br>LAURENCE TOBIN,<br>    *Appellants,*<br><br>v.<br><br>NATIONAL CINEMEDIA, LLC,<br>    *Debtors/Appellees,* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Case No. 4:25-CV-00613<br><br>Bankruptcy Case No. 23-90291 |

**MEMORANDUM OPINION AND ORDER**

Pending before this Court is an appeal from the Bankruptcy Court for the Southern District of Texas arising from the Chapter 11 bankruptcy proceedings for National CineMedia, LLC ("NCM"). (Bankr. No. 23-90291). Claimants MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin (collectively, "Appellants") and NCM filed cross-motions for partial summary judgment on the interpretation of the language of a bonus provision that provided for additional sums to be paid to Appellants should certain parameters be met. The Bankruptcy Court granted partial summary judgment for NCM, and Appellants appealed the issue to this Court. (Bankr. No. 23-90291, Doc. No. 755). This Court affirms the judgment of the Bankruptcy Court.

## I.      Factual Background and Procedural History

While the Bankruptcy Court provides detailed background facts in its Memorandum Opinion, *see* (Bankr. No. 23-90291, Doc. No. 755), this Court provides a limited background of the case to give context to this Opinion. NCM is in the business of selling on-screen advertising in movie theatres, and it does so on a nationwide basis. *See* (Doc. No. 25-1 at 53) ("NCM's core business is selling advertisements to be placed on the 'big screen' or in the lobbies of movie

theaters in business-to-business transactions."). Kinetoplay LLC ("Kinetoplay"), founded by Matthew Berry, Eric LaVanchy ("LaVanchy"), Laurence Tobin ("Tobin"), and an entity called SlyTrunk, was a company that developed online and mobile gaming applications, more commonly referred to as "apps." (Doc. No. 7 at 152).[1] Kinetoplay's primary product was Fantasy Movie League—a mobile gaming app designed to facilitate "a weekly fantasy sports-style game for movie fans, who were challenged to pick a mix of films then screening in cinemas to create a 'virtual movie theater' of their own." (*Id.* at 154). NCM, in an effort to expand its revenue stream and to expand its digital presence in the movie theatre industry, acquired the assets of Kinetoplay through an Asset Purchase Agreement (the "APA"). (Doc. No. 26-5 at 4). At the same time, NCM and Kinetoplay signed a "Side Letter," providing for promotion and marketing support to expand NCM's post-acquisition gaming products business segment. (*Id.*).

Two months later, LaVanchy and Tobin entered into employment agreements with NCM. (*Id.* at 5). MB Kinetoplay, an entity owned by Matthew Berry, and NCM also entered into a consulting agreement. (*Id.*). Those agreements contained Business Performance Provisions (referred to herein as "bonus provisions") that are at the heart of this dispute. *See, e.g.*, (*id.* at 14). The provisions for all pertinent purposes are identical:

> In the event that **the Business (as defined in the Asset Purchase Agreement**, dated May 16, 2017, among the Company, Kinetoplay Inc. and the Shareholders (as defined therein)) achieves Five Million Dollars ($5,000,000) in revenue **directly generated by the Business's digital gaming products in the Company's digital gaming pillar through advertising, sponsorship, tournaments, virtual goods and merchandise directly purchased from the Company's digital gaming pillar from the Company's website** or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, and others are mutually agreed upon by the Company and the Employee[/Consultant (collectively "Digital Gaming Revenue") in the twelve (12) months prior to the third (3rd) anniversary of the date hereof (the "Third Year Revenue"), the Company

---

[1] SlyTrunk is not an Appellant here nor a Claimant in the Bankruptcy Court. Matthew Barry, individually, is also not an Appellant here nor a Claimant in the Bankruptcy Court. Nevertheless, his company, MB Kinetoplay, is an Appellant and a Claimant.

> shall pay [the Third Year Bonus.] In the event that the Business achieves Seven Million Five Hundred Thousand Dollars ($7,500,000) in Digital Gaming Revenue in the twelve (12) months prior to the fourth (4th) anniversary of the date hereof (the "Fourth Year Revenue"), the Company shall pay [the Fourth Year Bonus.]

(*Id.*) (emphasis added).

While neither side claims this provision is ambiguous, they disagree on whether it should have included the various revenue streams. Conversely, there seems to be no debate, at least in the dispute before this Court, on how the bonus provision was actually applied. Instead, this debate is focused on whether NCM's accounting of the various revenue streams was compliant with the bonus clause.

NCM used the following general principles to allocate funds to Appellants to measure whether the revenues received reached the level to trigger the application of the bonus provisions. First, NCM credited Appellants whenever revenue was generated by advertising impressions delivered on the gaming produced in the digital gaming pillar.[2] (Doc. No. 26-4 at 8). Second, for those transactions involving both digital and on-screen components, NCM credited the Appellants for the portion of the contract earmarked for the gaming pillar. (*Id.*). When a contract was silent as to the apportionment, the Appellants were credited with 50% of the contract revenue. (*Id.*).

NCM takes the position that during the bonus years in question, the revenue amounts, as defined by the bonus provision, never reached the bonus threshold, and therefore, NCM did not pay out the bonus amount. (*Id.*). The Appellants obviously disagree. Their disagreement is focused upon what revenue streams NCM attributed (or, more accurately, did not attribute) toward the bonus threshold calculation. The Appellants sued in Colorado state court alleging breach of contract, breach of the implied duty of good faith and fair dealing, civil theft, and violations of the

---

[2] NCM's business concept had three somewhat discrete digital business departments that it labeled as "pillars." There was the commerce pillar, the gaming pillar, and the content pillar. The digital gaming pillar contained the Appellants' former business but is not defined in the written agreements.

3

state Wage Claim Act. (Doc. No. 23-5 at 69). Subsequent to that lawsuit being filed, NCM commenced Chapter 11 bankruptcy proceedings in Houston. (Bankr. No. 23-90291, Doc. No. 1). The Claimants (the Appellants in this matter) filed proofs of claim in the bankruptcy proceeding in which they reiterate the same allegations they made in the Colorado state lawsuit. *See, e.g.*, (Doc. No. 23-5 at 65). NCM contested these claims, and eventually, the Bankruptcy Court granted partial summary judgment in NCM's favor and determined that the Appellants did not reach the bonus threshold per the relevant contracts. (Bankr. No. 23-90291, Doc. No. 755).

The Bankruptcy Court's ruling is fairly straightforward and for the most part, the ruling was focused on the exact language in the parties' agreements. The Bankruptcy Court first analyzed the contractual prerequisites for the bonus payment to even come into play. It set out in bullet points the bonus criteria that had to be satisfied:

- Revenues must exceed $5,000,000;

- The revenue **must be directly generated by the Business's digital gaming products** in the digital gaming pillar; and

- The revenue **must be generated through advertising, sponsorships, tournaments, or virtual goods directly purchased from the digital gaming pillar** or a share of the revenue through purchases from an affiliate or partner site of the Company.[3]

(*Id.* at 8) (emphasis added).

While not included as a bullet point in the Bankruptcy Court's opinion, it earlier noted that the revenue had to be achieved by the "Business," as that term was defined in the APA. "Business" is defined in the APA as "the business of creating and developing, commercializing and managing the online/mobile application of movie and cinema-related entertainment gaming and content business for consumer engagement and use." (*Id.* at 2). Consequently, not only must the revenue

---

[3] The agreements also contained a provision for mutually agreed-upon revenue, but all parties concede that this component is not a factor in this appeal. *See, e.g.*, (Doc. No. 22 at 48).

be directly generated by digital gaming products through certain projected activities (advertising, sponsorships, tournaments, and virtual goods merchandise), but it also must have been directly generated by the Business (as defined above) via its activities in the online/mobile app "of movie and cinema-related entertainment gaming and content business for consumer engagement and use." (*Id.*). As one can see, there are not one, but multiple different criteria that must be satisfied in order for a certain revenue source to be included in the bonus calculation. These limitations apply regardless of whether the revenue stems from a product emanating solely from within the province of the gaming pillar or whether it stems from a product outside that pillar that integrates some gaming pillar feature or product.

Finally, it is of some importance, given some of the Appellants' claims, that the employee/consulting agreements that formalized the actual relationship between the Appellants and Appellee not only contain the bonus criteria, but they also have a merger clause:

> Complete Agreement. This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

*See, e.g.,* (Doc. No. 26-6 at 5). Thus, under these contracts, no prior representations, understandings or agreements survive the execution of the contracts.

The Court notes that the parties here and in the Bankruptcy Court argued that the contract was unambiguous. This Court finds no reason to conclude that this conclusion is incorrect.

The Appellants appealed to this Court attacking three primary rulings. Their first contention is that the Bankruptcy Court erred in granting partial summary judgment for NCM (and denying the Appellants' cross-motion for partial summary judgment) because the contracts unambiguously require that the bonus calculation includes the revenue from Integrated Deals, the Cinema Accelerator, and the On-Screen Sponsorships. *See* (Doc. No. 22 at 13–14). Second, the

5

Appellants contend that the Bankruptcy Court should have relied on certain parol evidence that proves these three components should have been included. (*Id.*). Finally, the Appellants claim that the Bankruptcy Court erred by disallowing the Colorado civil theft claims. (*Id.*). The Court addresses each of these contentions below.

## II.     Legal Standard

District courts are given jurisdiction to review appeals from the bankruptcy courts under 28 U.S.C. § 158(a)(1). Generally, district courts apply the same standard of review for bankruptcy court decisions as appellate courts apply to district court decisions. *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103–04 (5th Cir. 1992). Findings of fact are reviewed for clear error; issues of law and mixed questions of law and fact are reviewed *de novo. Szwak v. Earwood (In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.)*, 592 F.3d 664, 668 (5th Cir. 2009); *see also Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 542 F.3d 131, 134–35 (5th Cir. 2008). This Court "may affirm for any reason supported by the record, even if not [explicitly] relied on by the [bankruptcy] court." *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009); *In re Brown*, No. 4:18-CV-04416, 2020 WL 730878, at *1 (S.D. Tex. Feb. 13, 2020). The Court applies a *de novo* standard of review. *Szwak*, 592 F.3d at 668.

## III.     Analysis

As noted earlier, Appellants sought to recover a bonus based upon the inclusion of their share of three main revenue streams: (1) Cinema Accelerator, (2) Integrated Deals, such as the State Farm sponsorship, and (3) On-Screen Sponsorships. The Court will address each of those potential revenue streams below. First, however, the Court addresses what the Bankruptcy Court below actually ruled upon and what it did not address.

6

First, the Bankruptcy Court in the process of granting partial summary judgment for NCM and denying the Appellants' cross-motion found (as all parties contended) that the bonus provision was not ambiguous. It next found that:

1. Consumer data is not among the Business' digital gaming products as that phrase is used in the definition of Digital Gaming Revenue in the Service Agreements;

2. Revenue attributable to the use or sale of consumer data is not Digital Gaming Revenue as that term is defined in the Service Agreements;

3. Claimants are not entitled to credit in the Bonus Calculation for all Cinema Accelerator revenue during the Performance Periods simply because consumer data from the Business' digital games was ingested into NCM's data management platform. Claimants are only entitled to credit for revenue generated from impressions in the digital games themselves;

4. Cinema Accelerator revenue is not in the digital gaming pillar, and revenue attributable to Cinema Accelerator is therefore not Digital Gaming Revenue as that term is defined in the Service Agreements unless the ads were run on the actual digital gaming platforms;

5. Revenue attributable to on-screen advertising is not Digital Gaming Revenue as that term is defined in the Service Agreements;

6. Claimants are not entitled to credit in the Bonus Calculation for on-screen revenue during Performance Periods;

7. The entire value of any integrated contract is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

8. Claimants are not entitled to credit in the Bonus Calculation for the entire value of integrated contracts during the Performance Periods;

9. DOOH Service revenue is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

10. Claimants are not entitled to credit in the Bonus Calculation for DOOH Service revenue during Performance Periods;

11. LEN revenue is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

12. Claimants are not entitled to credit in the Bonus Calculation for LEN revenue during the Performance Period;

13. Advertising revenue that was not associated with the digital gaming products themselves is not Digital Gaming Revenue as that term is defined in the Service Agreements; and

14. Claimants are not entitled to credit in the Bonus Calculation for advertising revenue that was not associated with digital gaming products themselves during the Performance Periods.

15. DOOH Service revenue is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

16. Claimants are not entitled to credit in the Bonus Calculation for DOOH Service revenue during Performance Periods;

17. LEN revenue is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

18. Claimants are not entitled to credit in the Bonus Calculation for LEN revenue during the Performance Period;

19. Advertising revenue that was not associated with the digital gaming products themselves is not Digital Gaming Revenue as that term is defined in the Service Agreements;

20. Claimants are not entitled to credit in the Bonus Calculation for advertising revenue that was not associated with digital gaming products themselves during the Performance Periods;

21. Claimants' civil theft claim is disallowed; and

22. Claimants' claims for treble damages are disallowed.

(Bankr. No. 23-90291, Doc. No. 756).

The Bankruptcy Court did not rule upon the actual allowance of the Appellants' breach of contract claims, nor did it rule upon whether the Appellee properly performed the bonus calculations because that inquiry would have entailed the resolution of certain issues of fact. The Bankruptcy Court ultimately reserved the allowance of the Appellants' breach of contract claims for trial.

The points of error that Appellants have brought before this Court are not necessarily specific as to the multiple findings quoted above. As noted earlier, their briefing focuses only upon revenue from Integrated Deals, On-Screen Sponsorships, and Cinema Accelerator. As a secondary contention, one of the Appellants' complaints (buried in their over 60-page brief) is the use by the Bankruptcy Court of parol evidence from NCM with regard to the meaning of "Digital Gaming Pillar." Since this Court reviews questions of law *de novo*, this Court will review the matter solely based upon the contract that both sides have agreed is unambiguous foregoing any use of parol evidence to interpret the unambiguous contract. The Appellants also attack the Bankruptcy Court's finding dismissing their claims for Colorado civil theft. This Court will address this complaint first.

## A. Colorado Civil Theft Claims

Under Colorado law, a person or entity commits the offense of civil theft if he: (1) knowingly obtains, retains, or exercises control over anything of value that belongs to someone else without authorization or by threat or deception; (2) and intends to deprive that individual or entity permanently of that object of value. Colo. Rev. Stat. § 18-4-401 (2022). While this dispute is essentially a breach of contract suit, these kinds of claims can still be the basis of such a cause of action if the claimant has a property interest in the funds at issue. A mere expectancy or contractual right is not sufficient. *Million v. Grasse*, 549 P.3d 1043, 1051 (Colo. App. 2024). To qualify, the interest in the funds must be a specifically identifiable account or a wrongful obtaining, retention, or exercise of control over specifically identifiable funds that belong to plaintiff. *Id.* The *Million* opinion is controlling here because it holds that when the money due is yet to be determined pursuant to a specific formula it cannot be an "identifiable" sum as required by the

9

statute. *Id.* at 1052. The *Million* court also noted that in instances where it was unclear whether the plaintiff is owed money at all, such a claim is outside the scope of the statute. *Id.*

Appellants' brief concedes the fact that Colorado law requires a specific amount to be considered due and owing, but argues:

> *Million* does not require the establishment of a trust or escrow amount to prevail on a civil theft claim. Rather, it requires the parties to establish that they had a right to a specific payment at the time of taking.

(Doc. No. 9 at 57). That may be a guiding principle, but even in this Court, the Appellants have not referenced any summary judgment evidence that would hint at what specific payment "was owed"—if any payment was owed at all. *See generally* (Doc. No. 7). Appellants try to argue by analogy that their claim is similar to a W-2 wages claim. *See* (*id.*) ("For LaVanchy and Tobin, the Performance Bonuses were W-2 wages to which they had a constitutional property interest."). This contention falls woefully short. First, MB Kinetoplay is a company, and this argument certainly does not apply to the entity. The Appellants produced no evidence that a company, like it, ever received a W-2 form or was even supposed to receive such a form. Moreover, for both MB Kinetoplay and LaVanchy and Tobin, the unknown sums in question were not wages but rather a conditional bonus based upon certain revenues reaching certain thresholds. By definition, these are not specific sums, nor were they immediately due and owing. Those types of sums would require an allocation and, in some instances, an apportionment and calculations involving various revenue streams.

More importantly, the Colorado Supreme Court has held that a contractual dispute over a sum of money that may or may not be owed is not civil theft. *People v. Rotello*, 754 P.2d 765, 767 (Colo. 1988). The sums in this case were not guaranteed—they were contingent on certain parameters outlined by the plain terms of the agreements. The fact that one side claims these

parameters were satisfied and the other claims they were not does not subject the latter party to a theft claim. Lastly, the amount due, if any, is one of the issues upon which the Bankruptcy Court did not rule. It set that issue for trial and the results of that trial are not part of this appeal.

This Court agrees as a matter of law that the claims made under the Colorado civil theft statute are not sustainable.

## B. Breach of Contract Claims

As previously noted, the Appellants and Appellee filed competing motions for summary judgment in the Bankruptcy Court. Appellants here seek a reversal of the denial of their motion as well as a reversal of the granting of NCM's motion. Their points of attack on the breach of contract ruling fall into two categories: (1) contract interpretation and (2) the Bankruptcy Court's failure to use parol evidence that the Appellants' claim proves their entitlement to the bonuses.

While their attack on the Bankruptcy Court's opinion is somewhat scattershot, their overall goal, at least, here, appears to be to have this Court include three different components into the bonus calculations. Those revenue components result from: (1) On-Screen Sponsorships, (2) Integrated Deals, and (3) Cinema Accelerator. The Court addresses the first two categories jointly, describing these categories as "advertising and sponsorship revenue," (Doc. No. 7 at 47), the Appellants' briefing more or less lumps them together and lacks specific contractual analysis as to why those two categories should fall under the contract's bonus provision.

**On-Screen Sponsorships and Integrated Deals.** Appellants contend On-Screen Sponsorships and Integrated Deals should have been counted toward the Appellants' performance bonus. As the Appellants state, "[n]umerous clients sponsored, advertised, or otherwise incorporated digital gaming into their productions including State Farm, Tyson, Foods, US Air Force, Sony Playstation, and Dell XPS." (Doc. No. 7 at 22). According to the Appellants, "NCM

11

directly generated revenue from these products across numerous platforms by pitching them to clients—and then closing sales from those pitches." (*Id.*).

In this regard, the Appellants conclude that NCM received at least $5 million in revenue from State Farm and others that should have been included in their bonus calculations. While the Appellants made the broad assertions repeated above, their contention is clearly not tethered to how these revenues were derived and how the inclusion of those revenues is justified by the specific requirements of the contract language. Appellants make little or no attempt to demonstrate in any non-conclusory fashion how the contract supports their position—perhaps because the contract does not support such a widespread contention. In fact, given the half-hearted attempt by Appellees to support their claims, NCM goes so far in its Brief to claim that Appellants have legally "abandoned" this claim.

Regardless of whether Appellants have legally conceded this point, it is clear that for Appellants to receive credit for the revenue generated by an integrated product, that product (or portion thereof) must still fall within the parameters laid out by the contract. That revenue must be directly generated by the Business's gaming products. This requirement has several components, all of which must be satisfied:

1. The revenue must stem from the Business's creation, commercialization, development, or management of movie-related apps for consumer engagement and use; and

2. The revenue must be directly generated by the gaming products; and

3. The revenue must be directly generated through advertisement, sponsorships, tournaments or virtual goods and merchandise that is directly purchased from the Company's website (or an affiliate).

Appellants latch on to pieces of these requirements but conveniently skip over those requirements that they do not fulfill. For example, they argue:

To start, the first category of revenue to be included in the calculation was "advertising." Advertising means "the activity and industry of advertising things to

12

> people on television, in newspapers, on the Internet, etc." The very business of
> NCM was advertising. On the basis of this plain language, the Parties intended that
> this term *by itself* broadly encompass every means by which the Digital Gaming
> Products might be commercialized by NCM in NCM's current line of business.
>
> The revenue category for "Sponsorship" was similarly broad. It means "financial
> support from a sponsor." By the plain language, the term "sponsorship" was
> intended to capture revenue in which a client sponsored a Digital Gaming Product.
> Again, **there is no limitation on** the format of the sponsorship—any and all
> sponsorship revenue, whether on-screen, in a lobby, or online was supposed to be
> allocated for the purposes of the Performance Bonuses.

(Doc. No. 9 at 45–46) (emphasis added) (citing the Declaration of Laurence Tobin).

While the Appellants incorporate Tobin's statements about contractual intent to build their

argument, Tobin's statements (and his reliance on online dictionary definitions) have little effect

here. The statements may provide some fodder for the Appellants' brief, but legally, the statements

are a vain attempt to amend the terms of a written contract. First, it should be noted that according

to the wording of the contract, Tobin's recollections are just wrong. There are many limitations in

the contract language. Second, his understandings and/or interpretations are legally precluded from

effect by the contract's merger clause:

> Complete Agreement. This Agreement, those documents expressly referred to
> herein and other documents of even date herewith embody the complete agreement
> and understanding among the parties and supersede and preempt any prior
> understandings, agreements or representations by or among the parties, written or
> oral, which may have related to the subject matter hereof in any way.

(Doc. No. 26-6 at 5). This merger clause clearly precludes any such prior "understandings." Absent

this type of "evidence," Appellants have provided no competent summary judgment evidence that

would raise an issue of material fact. For example, Appellants have not referred the Court to any

competent summary judgment evidence that on-screen advertising stems from the "creation,

commercialization, development, or management" of movie-related apps for consumer

engagement or use, nor is there evidence that the on-screen revenue is directly generated by gaming

products. (Bankr. No. 23-90291, Doc. No. 255) (defining "Business" as "the business of creating

and developing, commercializing and managing the online/mobile application of movie and cinema-related entertainment gaming and content business for consumer engagement and use").

The same is true for those products containing a digital component. Integrated deals contain both digital and non-digital components. (Doc. No. 11 at 164). The primary example that the Appellants raise in this category is the State Farm contract. (Doc. No. 7 at 22, 27). That contract itself recognized that a portion was, in fact, due to be allocated in the applicable revenue stream toward the bonus provisions and apparently, that allocation was honored. (*Id.*). Nevertheless, Appellants claim that the entire value of the contract should be included—ignoring the contractual requirement that to be included all revenue had to be directly generated from the Business.[4] The Court relies on the plain terms of the written agreements and finds that this argument is meritless.

**Cinema Accelerator.** Appellants finally focus on the Cinema Accelerator product. Cinema Accelerator is a product that predates the relationship between Appellants and Appellee.[5] (Doc.

---

[4] Appellants arguments with respect to all three categories at issue also seem to ignore the first line of the bonus provisions that require the Business (as defined) achieve revenue directly generated by the Business's digital stream. In other words, it must be directly derived from the creation and development, commercialization, and management of online/mobile apps of movie- and cinema-related entertainment and content business for consumer engagement and use. Appellants provide no evidence how these business-to-business deals which generate revenue are, in fact, revenues directly generated from apps made for consumer engagement and use.

[5] NCM stresses in its briefing that the inclusion of Cinema Accelerator as a part of the revenue stream to be counted would have never happened and would have actually rendered the entire bonus calculation meaningless. First, NCM points out that Cinema Accelerator predates the APA, so it was an already existing product. As such, it argues that NCM would never have included it in a bonus calculation designed to account for new products. Second, it points out that at the time of the drafting of the contracts in question, Cinema Accelerator was already generating well in excess of the amount that would trigger the bonus at issue here. That being the case, NCM points out that neither party would have needed to describe a bonus calculation for a figure that Appellants would automatically qualify for with the Cinema Accelerator product. If that was the case, NCM contends that the entire language concerning what revenue would be counted toward the bonus would be meaningless. *See generally* (Doc. No. 22 at 41–45).

While this Court finds this argument to make sense, it need not and will not consider it, as this Court concentrates its analysis on the actual contract language and summary judgment evidence (or lack thereof). Moreover, this "understanding" of NCM would be precluded from consideration just like those of the Appellants due to the merger clause.

14

No. 11 at 162). It is not an app or game engaged with or used by consumers. (*Id.*). It is a service sold by NCM to advertisers. (*Id.*). While no party has pointed the Court to evidence that describes the actual mechanics of its operation, Cinema Accelerator, in theory, enables advertisers to retarget theater patrons with subsequent advertisements through the impressions or "clicks" obtained through third parties. Appellee describes how it functions as follows:

> Cinema Accelerator online campaigns require significant consumer data to effectively target the advertising client's desired audience. Data sources come in three varieties: first-party, second-party, and third-party. During the relevant time period, NCM's first-party data sources were data generated by NCM's owned and operated properties, like its digital games, as well as data received from NCM's affiliates and data from beacons located in theaters that were owned by NCM. Second-party data sources primarily consisted of geo-location data that NCM purchased and enhanced. Third party data sources consisted of data purchased from third parties about moviegoers.
>
> Data, regardless of source, was ingested into a data management platform ("DMP"), which then translated the identifier(s) associated with the data into an online form of identity that allows the identity to be found on different channels across the web. The DMP enables the use of the accumulated data to build customer models and target audience members with future advertising impressions. NCM then delivers targets ads, whether by delivering them through NCM's owned and operated properties or by acquiring impressions from third parties.

(Doc. No. 22 at 43–44).[6] Clearly, the data coming from second and third parties could not, by any stretch of the imagination, pertain to the Appellants' activities—directly or indirectly. Some of the first-party data did come from NCM's digital game platform, as well as from other NCM-owned sources. That being said, the fact that some data from Appellants' Business was transferred to NCM did not directly produce any revenue. What the Cinema Accelerator produced was data that eventually (after many permutations) produced some revenue.

---

[6] Here, the Court uses the description contained in the Appellee's brief. The Appellants do not contend that this description is materially false or misleading.

15

Appellants contend that 100% of the Cinema Accelerator revenue should be included in their bonus revenue calculations, yet they offer no evidence as to how the small percentage of data mined in part from its Business <u>directly produced</u> any revenue (much less 100% of the Cinema Accelerator revenue). Cinema Accelerator is not a gaming product, nor is it a product that is sold/marketed for "consumer engagement and use." It is important to remember that, in addition to the dual requirement that the revenue must be directly generated by the Business's digital gaming product and be directly generated through advertising, sponsorships, tournaments, and virtual goods and merchandise (which clearly excludes the Cinema Accelerator income), in order to qualify as revenue it must be achieved by the "Business"—which is defined as the sale of online/mobile applications of movie and cinema-related entertainment for consumer engagement. (Bankr. No. 23-90291, Doc. No. 255). Data that is mined and indirectly used to sell unrelated products or services to other businesses fails both "direct" requirements and falls outside of the clearly defined definition of "Business."

In sum, the revenue derived from mining data, repackaging it, and selling it to some business for use in the latter's advertising campaign is not:

1. Revenue achieved from the Business;

2. Directly generated from the Business's gaming products, and/or

3. Directly generated through advertising, sponsorships, tournaments, or virtual goods or merchandise.

It is merely an internal transfer of data which by itself generates no revenue. Therefore, the Court affirms the Bankruptcy Court's finding that (1) On-Screen Sponsorships, (2) Integrated Deals, and (3) Cinema Accelerator do not, as a matter of law, fall into the calculation of the bonus provisions based on the plain meaning of the contract.

16

## C. Parol Evidence

Lastly, Appellants argue that, if this Court finds the contracts to be ambiguous, it should consider parol evidence that raises at least a fact issue as to whether the Integrated Deals, On-Screen Sponsorships, and Cinema Accelerator revenues should be included in their bonus calculations.

The Colorado law that governs the contract interpretation here follows the general nationwide principles of contract law with a few wrinkles. Under Colorado law, the interpretation of a contract is generally a question of law for the court. *In re Parsons*, 272 B.R. 735, 752 (D. Colo. 2001). The primary goal of contract interpretation is to determine and give effect to the intent of the parties as it existed at the time the contract was executed. *Id.* "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation. Each word in an instrument is to be given meaning if at all possible." *Id.* A written contract that is complete and free from ambiguity represents the objective intent of the parties and will be enforced according to its plain language. *Id.* However, "[i]f the court determines a contract is ambiguous and its construction depends on extrinsic evidence, then the interpretation of the contract becomes a question of fact." *Id.* Whether a contract term is ambiguous is a question of law. *Id.*

"Under Colorado law, to determine if a particular term is ambiguous, 'the language of the agreement must be constructed by application of the accepted meaning of the words with reference to all of its provisions. The nature of the transaction which forms the contract subject matter must also be considered.'" *Id.* "Contractual terms are not rendered ambiguous merely because the parties subsequently urge diverse interpretations." *Id.*

In interpreting a contract, a court should admit and consider parol evidence only when the contract is so ambiguous that the parties' intent is unclear. *Id.* Although parol evidence may be

17

considered by the court to determine if a contract is ambiguous, if after hearing the evidence the contract remains unambiguous, the parol evidence should be stricken. *Id.* Absent allegations of fraud, accident, or mistake in the formation of the contract, parol evidence may not be admitted to add to, subtract from, vary, or contradict, change, or modify an unambiguous integrated contract. *Id.* Even when parol evidence is admissible to ascertain the intent of the parties, it may not be used to demonstrate an intent that contradicts or adds to the intent expressed in the writing. *Id.* This is especially true when that "evidence" is contractually barred by a merger clause such as the clause present in the existing contracts. Under Colorado law, courts "may consider extrinsic evidence regarding the meaning of the written terms, including evidence of local usage and of the circumstances surrounding the making of the contract" in order to determine whether a contract term is ambiguous. *Pub. Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). That being said, courts may not consider extrinsic expressions of intent by the parties. *Id.*

While the Appellant rightfully conditions their argument on a finding that the contract is ambiguous, they are essentially offering pieces of parol evidence that are: (1) extrinsic expressions of intent and (2) contrary to the contract's merger clause. *See* (Doc. No. 7 at 52) ("If the Court determines that the contracts are ambiguous . . . it may consider parol evidence that does not vary or contradict the terms of the agreement.").

As a preliminary matter, this Court finds no ambiguity in the agreements. The primary battle in this case focuses on the phrase "directly generated," and this is a phrase that needs no extraneous evidence to be understandable. The second important term is "Business," and that term has a specific contractual definition. As a consequence, this Court sees no need for the consideration of

18

any parol evidence from either side.[7] Finally, the vast majority of the evidence Appellants conditionally want this Court to consider goes directly to the "intent of the parties," which is explicitly barred by Colorado state law. One need only look at how the Appellants captioned their argument in their opening brief:

> The Parol Evidence Also Proves That The Parties Agreed That the Performance Bonus Calculation Include Revenue Generated By Integrated Deals, Cinema Accelerator, and On-Screen Sponsorships

*See, e.g.,* (Doc. No. 9 at 52). The next few pages of their brief set out various arguments that at their heart are what the Appellants claim they intended with respect to the bonus provisions or what they think NCM intended. This is just the kind of evidence that the Court cannot consider when weighing a dispute over an unambiguous contract. *See Pub. Serv. Co. of Colo.*, 132 P.3d at 339; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*, 213 F. Supp. 3d 1333, 1344 (D. Colo. 2016), *aff'd,* 734 F. App'x 586 (10th Cir. 2018); *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993).

Finally, this is not a situation where local usage or the circumstances surrounding the making of the contracts comes into play. This is a contract that may be viewed by some as "complex," but it is not ambiguous or unintelligible.[8] Therefore, the Court sees no need for parol evidence to enter into the discussion and has focused this analysis on the plain terms of the written agreements.

---

[7] While there apparently was a dispute below over the definition of the phrase "digital gaming pillar," the parties did not appeal this point, so the Court need not address it. Moreover, this Court finds that term to be perfectly understandable without parol evidence in the context of the entirety of the contract.

[8] See the Bankruptcy Court opinion where it states, "[a]though the Provision is complex, the Court sees no ambiguity." (Bankr. No. 23-90291, Doc. No. 755 at 9).

## IV.    Conclusion

While the Bankruptcy Court made over twenty individual findings in its ruling denying Appellants' Motion for Partial Summary Judgment and granting NCM's Motion for Partial Summary Judgment, the Appellants chose not to appeal those findings individually. Instead, their course of action on appeal to this Court was to narrow the appeal to the finding concerning four topics. It attacked the Bankruptcy Court findings with regard to its rulings on: (1) Integrated Deals, (2) On-Screen Sponsorships, (3) Cinema Accelerator, and (4) the denial of the civil theft claims. That being the case, this Court has confined its opinion to these topics.

The Court, as did the parties and the Bankruptcy Court, found the contract to be unambiguous. This Court found no need to rely on any outside explanations or parol evidence to explain any of the terms in the contract. In fact, given the contract's clear language (in addition to its straightforward merger provision), the Court finds no need and certainly no legal reason to rely on the parol evidence proffered by either side.

The Court finds no reason to disturb the judgment of the Bankruptcy Court. It finds that the Appellants have no cause of action under Colorado's civil theft statute. It also finds for the reasons articulated above that the bonus calculation did not improperly exclude On-Screen Sponsorships, Integrated Deals, or Cinema Accelerate. Those sums were not directly generated by the Business's (as that term is defined) gaming products through advertising, sponsorship, tournaments, or virtual goods and merchandise. This result takes into account not only the requirements that such revenue be directly generated but also that it must be directly generated by the business of creating and developing, commercializing and managing online/mobile applications of movie- and cinema-related entertainment and content business for consumer

engagement and use. The revenue generated in the three business segments in question does not satisfy the requirements.

The decision of the Bankruptcy Court is **AFFIRMED**.

It is so ordered.

Signed on this the ___23ʳᵈ___ day of March 2026.

Andrew S. Hanen
United States District Judge